369 So.2d 1016 (1979)
Edward A. WHEATON and Edith Wheaton, His Wife, Appellants,
v.
BOHNERT ROOFING & SUPPLY CO., INC., Appellee.
No. 78-1121.
District Court of Appeal of Florida, Third District.
April 24, 1979.
*1017 Brumer, Moss, Cohen & Rodgers, Daniels & Hicks and Sam Daniels, Miami, for appellants.
Knight, Peters, Pickle, Niemoeller & Flynn, Jeanne Heyward, Miami, for appellee.
Before HENDRY and SCHWARTZ, JJ., and CHARLES CARROLL (Ret.), Associate Judge.

ON REHEARING GRANTED
PER CURIAM.
The petition of the appellants for rehearing having brought to our attention that in our opinion filed March 13, 1979, certain statements relating to the amounts in the judgment were inaccurate and that the judgment as originally entered by the trial court was correct as to the amounts therein, the petition is granted. Whereupon our opinion filed March 13, 1979, is withdrawn and is replaced by this revised opinion, which shall stand as the opinion and judgment of this court on the above-styled appeal.

REVISED OPINION
PER CURIAM.
This is an appeal by the plaintiffs below from a judgment entered for the defendant Bohnert Roofing & Supply Company, Inc., upon the granting of said defendant's renewed motion for a directed verdict after verdict and judgment had been rendered in favor of plaintiffs. We find error and reverse.
*1018 The plaintiff, Edward A. Wheaton, a building contractor, was injured in a fall to a lower floor when a planking panel supplied by the defendant upon which he was standing or walking in the course of laying such panels on rafters, broke under his weight. Wheaton filed this action for damages against the defendant-supplier. His wife, the plaintiff Edith Wheaton, joined in the action, seeking derivative damages. As amended, the complaint charged the defendant-supplier with negligence by furnishing planking material which because of defect or weakness was insufficient to support his weight when walked upon, knowing that it would be so used in its installation, and by failing to warn the plaintiff thereof. The complaint as amended also sought recovery therefor against said defendant on the theory of strict liability of the supplier. See West v. Caterpillar Tractor Company, Inc., 336 So.2d 80 (Fla. 1976).
On trial of the action the jury found the plaintiff Edward Wheaton and the defendant Bohnert Roofing & Supply Company, Inc. each were guilty of negligence, assigning 25% of the negligence to the plaintiff Wheaton and 75% thereof to the defendant Bohnert, and found the total amount of damages to be $75,000.00 as to the claim of the plaintiff Edward Wheaton and $15,000.00 as to the claim of the plaintiff Edith Wheaton. As verified by the questioning of the jury by the court, those damages were determined by the jury as the amounts to be awarded to the plaintiffs after deducting from the total damages the portion properly allocable to the negligence of the plaintiff, as the court had charged the jury to do.[1]
After the verdict and judgment, and within the time required, the defendant Bohnert filed its motion for judgment to be entered in accordance with its motion for directed verdict upon which ruling had been reserved [Fla.R.Civ.P. 1.480(b)] and moved for new trial. The trial court granted the motion for directed verdict and entered judgment for said defendant. The order of the court provided that in the event the judgment so entered should be reversed, the motion for new trial was conditionally denied.
The rule relating to a trial court's consideration of a defendant's motion for a directed verdict, as stated by the Supreme Court in Mullis v. City of Miami, 60 So.2d 174, 176 (Fla. 1952), that "[t]he court should not direct a verdict for the defendant, unless it is clear that there is no evidence whatever adduced that could in law support a verdict for plaintiff", is applicable also when the trial court has for consideration a defendant's motion after verdict for judgment based on the motion for directed verdict made at trial which was not granted. Whitman v. Red Top Sedan Co., Inc., 218 So.2d 213 (Fla.3d DCA 1969).
On review of a judgment for defendant based on a directed verdict, the appellate court is required to observe the settled rule, as stated by the Supreme Court in Rodi v. Florida Greyhound Lines, 62 So.2d 355, 356 (Fla. 1953), to consider the testimony adduced in the cause in the light most favorable to the plaintiff, disregarding conflicts in the evidence and indulging in plaintiff's favor every reasonable intendment deducible from the evidence.
On consideration of the evidence disclosed in the record in light of the rule set out above, we are impelled to conclude the trial court was in error in holding that no evidence was adduced that in law could support a verdict for the plaintiffs.
*1019 Included in the facts and testimony in the record were the following. Edward Wheaton was a building contractor on the construction of a residence. The specifications called for use of "Fibertex" roof decking, which was a planking material made of pressed wood fibers. The material was supplied by the defendant Bohnert, and was delivered by it by truck and raised to roof level. The delivery was made by Bohnert's roofing superintendent Milton Bullema, who was familiar with the product and had used it previously. Wheaton had had no experience with the product. With a carpenter-helper, Wheaton proceeded to install the panels on the rafters. The first row of panels was nailed down. In order to shorten the time of unloading, Bullema requested that Wheaton put the panels in place on the rafters without taking the time to nail them down. The panels were nine feet long, 32 inches wide, and by specification and building code were to be two inches thick. Each weighed between 100 and 125 lbs. They were equipped with tongue and groove, and in placing a row of panels it was necessary to carry them from the truck lift, across the panels already laid. There was evidence that Wheaton was concerned as to whether the unnailed panels were strong enough to support him. When he questioned Bullema on that feature, Bullema assured him they were safe to walk upon. Also Wheaton questioned the safety of the panels when some appeared to him to be "culls", and he observed that some were less than two inches thick. Again he was assured by Bullema that it was safe to walk on the panels.[2] The exact thickness of the *1020 panel which broke was not established, and the evidence did not show any specific defect of the panel which broke. However, the evidence showed that of these panels which he was thus assured were of sufficient strength to support him, when Wheaton stepped on one it failed to support him, and broke under his weight.
On that evidence the jury reasonably could have, and in fact did find the defendant-supplier guilty of negligence to a certain degree [and also could have and did find the plaintiff Wheaton guilty of negligence in some degree].
It was not unreasonable for the jury to find negligence on the part of the plaintiff, where he proceeded to walk on the unnailed panels when he had misgivings as to their safety, and after having observed that an unnailed panel "gave" when he walked on it. However, the jury reasonably could find that the reason the plaintiff so continued to walk on said unnailed panels in the performance of work in the manner requested by Bullema, was because of and in reliance on Bullema's assurances of safety. The jury's finding of negligence of the defendant-supplier was reasonable, based on the evidence that its employee was responsible for the plaintiff's action of walking on the panels while unnailed and because defendant's agent advised plaintiff it was safe to do so when in fact it was not. In point on this feature are Propper v. Kesner, 104 So.2d 1 (Fla. 1958), and Sonnenborn v. Gartrell, 179 So.2d 385 (Fla.3d DCA 1965). See also Lebrecht v. Bethlehem Steel Corp., 402 F.2d 585 (2nd Cir.1968); Virginia Dare v. Schuman, 175 Md. 287, 1 A.2d 897 (1938).
For the reasons shown above, without need to deal with other grounds, the judgment is reversed, and the cause is remanded with direction to reinstate the judgment previously entered in favor of plaintiffs.
Reversed and remanded.
NOTES
[1] The court had charged the jury that if they found both the defendant and the plaintiff Wheaton guilty of negligence, "you will award the Wheatons the total amount of the damages sustained by them reduced in the same proportion that Mr. Wheaton's negligence contributed to his own injury and damage."

Further, relating to the form of special verdict submitted to the jury, the court charged:
"And the fourth question is what is the total amount of damages if any do you find that the plaintiffs have sustained as a result of the accident? Edward A. Wheaton, and a blank, and Edith Wheaton, and a blank. And whatever figure that you place here will be a final calculation, if any, taking into consideration the percentage, if any, as to a comparative negligence."
[2] Regarding Wheaton's concern as to whether it was safe to walk on the panels which were unnailed and some of which he observed to be of less than required thickness and of questionable quality, and the assurances he received from Bohnert's agent as to their safety, Wheaton's testimony included the following:

"A * * * But my plans was to anchor the whole thing as we went.
"Q And why didn't you pursue that?
"A Well, because I was told that I was taking up too much time and was told just to lay it on the rafters.
"Q Who told you this?
"A The driver.
"Q Of the truck?
"A That's correct.
"Q And he said he couldn't wait for you to nail all the 
"A Well, he didn't have that much time. It was too time-consuming. And I said, well, will the stuff hold, and he said sure it will hold."
* * * * * *
"Q And what about when you walked on the planking material but on a portion of the planking material that was just over open space, that did not have a rafter?
"A Then it would give. As a matter of fact, we stopped after our first  after we started leaving our first plank on the second row, as you would step 
"Q The first row was nailed down"
"A Yes, yes.
"Q You're sure of that?
"A Oh, I'm positive * * *"
"Q Did the driver of the truck  I'm going to call Mr. Bullema, because he's already indicated he was the driver  did he ever indicate to you that there was anything dangerous about walking over these portions that was not nailed down?
"A No. As a matter of fact, we just didn't  if I indicated that we just nailed one row, that's incorrect. We had started nailing, and I don't know whether we had the second row nailed and part of the third, I don't remember.
I do remember we were laying them and nailing them until we were told it was taking too much time, and we didn't have to do that, just le's get it unloaded, and we could do that after he was gone.
"Q You asked him if it was safe to do so, and he indicated yes?
"A Oh, yes, yes."
* * * * * *
"Q * * * When you were laying these planks, did you observe any variation in the thickness of the planks?
"A Sure, sure, sure.
"Q Could you tell me how you observed that?
"A Well, it was just a definite difference in it. There was a good half inch, and I asked the man  I said, gee, what's the story? The look like you've got some culls in there.
"Q What's a cull?
"A Well, something other than standard.
"Q Okay.
"A And he said no, that's the way it comes from the factory. And I said is it safe? I said, they're really giving quite a bit.
He said, no, we do this all the time. * *"
[After Wheaton called Bullema's attention to the fact that he noted some panels were less than the specified thickness.]
"Q And the response was this is the way it comes?
"A Well, the man, and he was very frank about it, I mean, he wasn't telling me a lie, I'm sure. You know, that's the way it came from the factory, but it was safe. I said it sure is giving a lot, and he said no, it's safe. He said I've used it for years."
[Regarding the safety in walking on panels which were nailed down as compared to unnailed panels, Bullema testified as follows.]
"Q Did you ever mention to Mr. Wheaton that these planks are weaker when they are not nailed down?
"A No, I did not mention it, but I figured he would know that because he's a contractor and a builder."